IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| LARRY F. TURNAGE, JR., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil No.  11-4071-JAR |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| COMMISSIONER OF ) | |
| SOCIAL SECURITY, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court for judicial review of Defendant Commissioner of Social Security's final decision denying Plaintiff Larry Turnage, Jr.'s application for disability benefits under Title XVI of the Social Security Act.[1]  Upon *de novo* review, the Court reverses and remands this case to Defendant pursuant to sentence four of 42 U.S.C. §405(g).

**I.     Procedural History**

In 2008, Plaintiff filed applications for disability insurance benefits under Title II[2] and Title XVI of the Social Security Act, claiming an onset date of disability of January 1, 1985. Plaintiff's applications were denied initially and upon reconsideration.  Plaintiff timely requested a hearing before an administrative law judge ("ALJ").  At the ALJ hearing on May 6, 2010, Plaintiff amended his alleged onset date of disability to July 11, 2008, the date of his application for benefits, thereby withdrawing his Title II claim.  The ALJ issued a decision finding that Plaintiff was not disabled; the Appeals Council denied plaintiff's request for review of the ALJ's decision.  Plaintiff then timely sought judicial review before this Court.

---

[1] 42 U.S.C. §§ 1381–1383f.

[2] 42 U.S.C. §§ 401–434.

## II.     Standard for Judicial Review

Judicial review under 42 U.S.C. § 405(g) is limited to whether the defendant's decision is supported by substantial evidence in the record as a whole and whether the defendant applied the correct legal standards.[3] The Tenth Circuit has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[4] In the course of its review, the court may not re-weigh the evidence or substitute its judgment for that of defendant.[5]

## III.    Legal Standards and Analytical Framework

Under the Social Security Act, "disability" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . ."[6] An individual "shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."[7] The Secretary has established a five-step sequential evaluation process to determine whether a claimant is disabled.[8] If the ALJ determines the claimant is disabled or not disabled at any step

---

[3]*See White v. Massanari*, 271 F.3d 1256, 1257 (10th Cir. 2001) (citing *Castellano v. Sec'y of Health & Human Servs*., 26 F.3d 1027, 1029 (10th Cir. 1994)).

[4]*Id*. (quoting *Castellano*, 26 F.3d at 1028).

[5]*Id.*

[6]42 U.S.C. § 1382c(a)(3)(A).

[7]*Id.* § 1382c(a)(3)(B).

[8]*Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1983).

along the way, the evaluation ends.[9]

Plaintiff does not challenge the ALJ's determination at step one that Plaintiff has not engaged in substantial gainful activity since July 11, 2008, the application date. [10]  Nor does Plaintiff challenge the ALJ's determination at step two that Plaintiff has medically severe impairments: status post left ankle fracture and deformity, status post right foot gunshot wound, borderline intellectual functioning, and depressive disorder.  But Plaintiff does challenge the ALJ's determination at step three that none of Plaintiff's impairments, nor the combination of impairments medically equal one of the listed impairments.  Plaintiff also challenges the ALJ's determination of his residual functional capacity ("RFC") at step four, including the ALJ's evaluation of Plaintiff's credibility and the ALJ's evaluation of the opinions of the consulting physician as well as the examining and consulting psychologists.

**IV.    Discussion**

Plaintiff maintains that the ALJ erred in: (1) failing to consider whether his impairments meet the requirements for Listing 12.05 Mental Retardation;[11] (2) failing to perform a function-by-function assessment of his RFC; (3) failing to properly assess and evaluate the opinions of a consulting physician and psychologist; and (4) failing to properly assess Plaintiff's credibility concerning the degree and severity of pain.  Because the Court finds that the ALJ erred in failing to determine whether or not Plaintiff meets the listing for mental retardation at step three, the Court reverses Defendant's decision.  This opinion will thus not address Plaintiff's other claims

---

[9]*Id.*

[10]*See Williams v. Bowen*, 844 F.2d 748, 751 (10th Cir. 1988).

[11]20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05.

3

of error.[12]

### A.  Listing 12.05 (Mental Retardation)

At step three, the ALJ determined that Plaintiff has no impairment or combination of impairments that meet or equal the medical listings 12.02 (Organic Mental Disorders) or 12.04 (Affective Disorders).[13]  Plaintiff does not challenge these findings,[14] but contends the ALJ erred in failing to determine whether his impairments or combination of impairments meet or equal listing 12.05 (Mental Retardation).[15]  The Court agrees.

Plaintiff bears the burden of proving that his impairment meets or equals a listed impairment.[16]  To meet a listing, a claimant must have an impairment that satisfies all of the specified medical criteria for the listing.[17]  If the claimant has an impairment that is described in the listings, but does not exhibit one or more of the findings specified in the listing, or one or more of the findings is not as severe as specified in the particular listing, the claimant must establish other impairment related findings that are at least of equal medical significance to the required criteria.[18]

---

[12] The Court notes error at step 4 as well.  Most notably, the ALJ's RFC assessment that Plaintiff could work with simple instructions fails to include or explain the exclusion of Dr. Pulcher's qualifier that Plaintiff's ability to understand instructions depends on whether the instructions are given auditorally or visually.

[13] 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 12.02, 12.04.

[14] Nor does Plaintiff challenge the ALJ's findings that he does not meet the requirements of listings 1.02 (major dysfunction of a joint) or 1.03 (reconstructive surgery of a major weight-bearing joint).

[15] 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05.

[16] *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Nielson v. Sullivan*, 992 F.2d 1118, 1120 (10th Cir. 1993).

[17] *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).

[18] *See* 20 C.F.R. § 416.926; *Avery v. Astrue*, 313 F. App'x 114, 122 (10th Cir. 2009).

The introductory paragraph for listing 12.05 states,

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e. the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A,B,C, or D are satisfied.[19]
> . . . .
>
> C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.[20]

As the general description of the 12.00 series of listings[21] explains,

> [t]he structure of the listing for mental retardation (12.05) is different from that of the other mental disorders listings. Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation. It also contains four sets of criteria (paragraphs A through D). If [a claimant's] impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing.[22]

### B.  Plaintiff Did Not Waive his Claim Under this Listing

Defendant argues that Plaintiff waived this argument by not raising it before the ALJ, and by conceding that there was no evidence supportive of mental retardation.  The Court has reviewed the transcript of the ALJ hearing and disagrees with Defendant's characterization of Plaintiff's counsel's statements.   During the hearing, the ALJ and Plaintiff's counsel had the following relevant exchange:

---

[19] 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05.

[20] *Id.*

[21] 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00 (Mental Disorders).

[22] *Id.*

| | |
|---|---|
| ALJ: | He talked about his [INAUDIBLE} scale IQ.  Let me ask you, Mr. Cox, you're alleging an onset date of 1985 at age 13, and what's that based on? |
| ATTY: | When I asked him what the significance of that date was, they thought that about the time he was first placed into special ed courses when he was in school.  I told him quite honestly that would be a hard onset date to defend perhaps. |
| ALJ: | Okay.  And then are there any school records to substantiate that issue? |
| ATTY: | No, Your Honor.  Apparently they keep high school records for about 10 years, and it's been more than that, so we don't have any high school records. |
| ALJ: | Right.  But at 13 years old, he would have been middle school, wouldn't he? |
| ATTY: | Yes, he might have still been junior high at that point. |
| ALJ: | There's no records available? |
| ATTY: | No that we've gotten, no, sir. |
| ALJ: | Okay. So what are you alleging at the age of 13, mental retardation? |
| ATTY: | That would probably be the only listing that would support an onset date at that point would be the mild mental retardation, but the only actual IQ scores of course are those that Dr. Poulter did.[23] |

Immediately after this exchange, the ALJ told Plaintiff's counsel to proceed with questioning Plaintiff.  Counsel then examined Plaintiff, among other things, about being in special education courses, dropping out of school in the tenth grade, and the fact that Plaintiff made mostly Ds, could read and write only "a little bit," and could not read a newspaper.[24]  Then, the vocational expert testified.  Then the ALJ and Plaintiff's counsel had this further exchange,

| | |
|---|---|
| ALJ: | Now, are you going to leave the AOD, Mr. Cox, at that age?  Are you pursuing that sort of relief or not? |
| ATTY: | Judge, realistically, I think it would be very, very difficult to establish an onset before his date last insured.  I would encourage him to simply amend his onset to the date of his application for SSI |

---

[23]Doc. 8, Attach. 3, R. at 47-48.

[24]*Id.* at 48.

6

and seek SSI only.[25]

Plaintiff's counsel then conferred with Plaintiff off the record, and then on the record stated that Plaintiff was "agreeable to amending his onset date to the date of his SSI application," and agreed that Plaintiff would not be eligible for Title II benefits.[26]

Defendant's argument that Plaintiff waived any claim that he met the listing for mental retardation is wholly without merit.[27] Plaintiff's counsel merely explained that although Plaintiff had mild mental retardation as early as junior high, lacking any school records of his IQ, Plaintiff was amending his onset date to July 2008, recognizing that his only available IQ scores were those given by Dr. Pulcher[28] in August 2008. Plaintiff's counsel then examined Plaintiff, obviously for the purpose of establishing that Plaintiff's mental retardation initially manifested during the developmental period, as required by listing 12.05. At no time expressly or impliedly did Plaintiff waive the claim that he met listing 12.05.

To be sure, to establish that a claimant meets listing 12.05, the evidence must show that the mental retardation "initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22."[29] But, by amending his onset date to July 2008, shortly before Dr. Pulcher rendered the only available IQ scores, Plaintiff did

---

[25]*Id.* at 54-55.

[26]*Id.* at 55-56.

[27]*See Sims v. Apfel*, 530 U.S. 103, 107 (2000)(holding that claimant need not raise issue to the Commissioner before raising issue to court upon review); *Hackett v. Barnhart*, 395 F.3d 1168, 1176 (10th Cir. 2005) (citing *Sims v. Apfel*, and holding claimant need not preserve issues before the Commissioner.)

[28]Although he is referred to as "Dr. Poulter" in the transcript of the ALJ hearing, the medical records evidence that the consultative examiner was David Pulcher, Ph.D.

[29]20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05.

not effectively waive a claim that he met listing 12.05.

There is no requirement that the IQ scores within the stated range must have been taken during the claimant's developmental period.[30] The claimant can meet the first criteria with other evidence of mental retardation. Although the Tenth Circuit has not squarely ruled on the issue, it has noted that other circuits have liberally construed the early manifestation requirement to not require a claimant to affirmatively prove mental retardation prior to age 22, if there is no evidence that his IQ has changed.[31] The Eleventh Circuit, for example, presumes that "IQ remains fairly constant throughout life,"[32] as do the Seventh and Eighth Circuits.[33] The Fourth Circuit has noted that the absence of IQ testing during the developmental period does not mean that the mental retardation did not manifest before the age of 22.[34] And, the Fifth Circuit has relied upon IQ testing that took place after the defendant reached the relevant age as evidence that the defendant had significant subaverage intellectual functioning that manifested during the developmental stage.[35] Presumably for this reason, Plaintiff's counsel examined Plaintiff about his reading and academic abilities during high school, his grades and his course of special

---

[30] 65 Fed. Reg. 50,746-01, 50,753 (Aug. 21, 2000) (to be codified at 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00G) (permitting the Commissioner to use current evidence to infer when the impairment began).

[31] *See McKown v. Shalala*, No. 93-7000, 1993 WL 335788, at *3 (10th Cir. Aug. 26, 1993); *see also Munzert v. Astrue,* 502 F. Supp. 2d 1148, 1152-53 (D. Kan. 2007); *Soverns v. Astrue*, 501 F. Supp. 2d 1311, 1320 (D. Kan. 2007).

[32] *Hodges v. Barnhart*, 276 F.3d 1265, 1269 (11th Cir. 2001).

[33] *Guzman v. Bowen*, 801 F.2d 273, 275-76 (7th Cir. 1986); *Muncy v. Apfel*, 247 F.3d 728, 734 (8th Cir. 2001).

[34] *Branham v. Heckler*, 775 F.2d 1271, 1274 (4th Cir. 1985).

[35] *Morris v. Dretke*, 413 F.3d 484, 487 (5th Cir. 2005)(finding IQ scores obtained after the defendant was eighteen were probative on issue of whether he manifested significantly subaverage intellectual functioning before that age.)

education.

Despite dialoguing with Plaintiff's counsel about mental retardation and despite receiving evidence that Plaintiff exhibited deficits in adaptive functioning and other evidence pointing to subaverage general intellectual functioning as early as junior high school, the ALJ failed to mention whether Plaintiff met listing 12.05, much less analyze the listing. This was clear error.

### C.     The ALJ's Error Was Not Harmless

Defendant asserts that the ALJ's failure to determine whether Plaintiff met listing 12.05 at step three was harmless, because the evidence demonstrates that Plaintiff had borderline intellectual functioning, not mental retardation. The Court disagrees. As the Tenth Circuit explained in *Lax v. Astrue*,[36] to meet listing 12.05C, a claimant must meet three criteria: (1) significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period (this criterion is based upon the capsule definition in the introductory paragraph); (2) a valid verbal, performance, or full scale IQ of 60 through 70; and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function.[37] Here, there is substantial evidence and no dispute that Plaintiff meets the second and third criteria.

#### 1.     Plaintiff has a valid verbal, performance, or full scale IQ of 60 through 70

Dr. Pulcher, a state agency examining psychologist, administered the WAIS-III and WMS-III IQ tests to Plaintiff in August 2008. On the WAIS-III, Plaintiff had a verbal IQ score of 66, a performance IQ score of 79, and a full scale IQ score of 69. Dr. Pulcher characterized

---

[36] 489 F.3d 1080, 1085 (10th Cir. 2007).

[37] *Id.*

the verbal and full scale scores as "extremely low," and the performance scale as "borderline." Although Plaintiff's performance IQ score was above the range of 60 to 70, listing 12.00 for all mental disorders directs that "[i]n cases where more than one IQ is customarily derived from the test administered, e.g. where verbal, performance, and full scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05."[38] Two of three of Plaintiff's IQ scores were in the range of 60 through 70: the verbal score of 66 and the full scale score of 69.

To meet listing 12.05C, these IQ scores must be valid. Defendant does not challenge the validity of the scores, and there is no evidence refuting their validity.[39] The appendix to the pertinent regulation explains that "since the results of an intelligence test are only part of the overall assessment, the narrative report that accompanies the test results should comment on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation."[40] Dr. Pulcher's narrative report vouches for the validity of these scores. Dr. Pulcher found that the WAIS-III scores were similar to and consistent with the WMS-III IQ scores.[41] This is indicative that the scores are valid. Dr. Pulcher further noted in his narrative report that the differences between Plaintiff's verbal and performance IQ scores were statistically significant, but "suggestive of relative weakness in completing verbally a [sic] mediated tasks with relative strengths, though still at a borderline level, in performance tasks."[42]

---

[38]20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(D)(6)(d).

[39]*Cf. Lax v. Astrue*, 489 F.3d 1080, 1807 (10th Cir. 2007).

[40] 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00D.6.a.

[41]Doc. 8, Attach. 9, R. at 357.

[42]*Id.* at 356.

Dr. Pulcher found this same relative weakness in "tasks requiring retention and manipulation of auditorally presented data" and in "processing and remembering auditorally obtained data versus visually obtained information."[43]

In addition to finding consistent scoring across the spectrum of tasks and abilities, Dr. Pulcher did not question the validity of the scores based on Plaintiff's performance. Dr. Pulcher noted that Plaintiff "was superficially cooperative with test administration, but was mildly agitated from time to time during the administration though he never refused to participate or to complete any requested subtests. He stated several times 'this is getting me frustrated.'"[44] Dr. Pulcher found that Plaintiff's presented irritability was genuine, concluding, "[a]bility to work with others without distractions or interference from psychological symptoms is possibly problematic due to the patient's observed irritability."[45] Dr. Pulcher also found Plaintiff credible, in that "[t]he frequency and severity of complaints presented by this claimant are generally consistent with his alleged physical limitations. His report and behavior in the interview were similarly consistent."[46] Thus, Plaintiff's IQ scores are valid and meet the requirement of Part C of listing 12.05.

### 2.    Plaintiff has additional and significant limitations

To meet listing 12.05C, a claimant must also have a physical or other mental impairment that imposes an additional and significant work-related limitation of function. The Tenth Circuit

---

[43]*Id.* at 356-357.

[44]*Id.* at 356.

[45]*Id.* at 358.

[46]*Id.*

has defined a significant work-related limitation of function as a severe physical or other mental impairment, apart from the decreased intellectual function, as determined at step 2.[47] The regulations do not define "significant," but the Tenth Circuit has joined other circuits in holding that while a "significant limitation" of function for purposes of § 12.05C, is one that has more than a slight or minimal effect on the claimant's ability to perform basic work, the limitation "need not be disabling in and of itself."[48] Here the ALJ properly found at step 2 that Plaintiff had the severe physical impairments of status post left ankle fracture and deformity and status post right foot gunshot wound, as well as the additional mental impairment of depressive disorder.[49] This determination at step 2 suffices to show significant work-related limitations for purposes of meeting the requisites of listing 12.05.

### 3. There is evidence that Plaintiff meets the capsule definition of 12.05C

To meet listing 12.05C, the claimant must also meet the so-called capsule definition of mental retardation, found in the introductory paragraph of listing 12.05C. Defendant argues that the ALJ did not err in failing to evaluate whether Plaintiff met listing 12.05C because Plaintiff does not meet the capsule definition. While the ALJ did not expressly state that, it appears that the ALJ gave credence to the opinions of Dr. Pulcher, as well as Dr. Carol Adams, a state agency consulting psychologist, both of whom opined that Plaintiff had "borderline intellectual functioning."

Defendant urges the Court to find that this diagnosis precludes a finding that Plaintiff

---

[47] *See Hinkle v. Astrue*, 132 F.3d 1349, 1352 (10th Cir. 1997).

[48] *Id.* (citing *Warren v. Shalala,* 29 F.3d 1287, 1291 (8th Cir.1994) (collecting cases); *Branham v. Heckler,* 775 F.2d 1271, 1273 (4th Cir.1985)).

[49] Doc. 8, Attach. 3, R. at 15-16.

meets the capsule definition of "mental retardation," in the introductory paragraph of listing 12.05C. But, the capsule definition of mental retardation is "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period . . . ."[50] Defendant cites to no authority that a diagnosis of "borderline intellectual functioning" precludes a determination that a claimant meets the capsule definition and other requirements of listing 12.05C. Instead, Defendant points out that under the DSM-IV, the diagnoses of mental retardation and borderline intellectual functioning are different. But the Social Security Administration did not employ the DSM definition of mental retardation for listing 12.05C. Instead, it opted for a more flexible standard, which incorporated the essential elements of multiple, but widely used definitions of mental retardation.[51] For this reason, a number of courts have rejected Defendant's view, and found that someone with "mild mental retardation"[52] or "Borderline to Low Average range of intelligence,"[53] as well as IQ scores within the listed range, met the capsule definition.[54] A formal diagnosis of mental retardation is not required to satisfy the listing requirements of 12.05C;[55] and a diagnosis of "borderline intellectual functioning" under the DSM-IV, does not preclude a determination of disability

---

[50] 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05.

[51] *See* 67 Fed. Reg. 20,018, 20,022 (Apr. 24, 2002).

[52] *See Harrold v. Astrue*, 299 F. App'x 783, 788 (10th Cir. 2008).

[53] *See e.g*, *Devoe v. Barnhart*, No. 3:05cv746(MRK)(WIG), 2006 WL 1272614, at *6 (D.Conn. Mar. 15, 2006) (finding that plaintiff met the capsule definition based on examiner's description of plaintiff's IQ scores as within the borderline to low average range of intelligence, and the fact that two of plaintiff's three test scores fell squarely within the 12.05C range).

[54] *See also* 67 Fed.Reg. 20,018-01 (Apr. 24, 2002).

[55] *Maresh v. Barnhart*, 438 F.3d 897, 899 (8th Cir. 2006).

under listing 12.05 for mental retardation.[56]  Nor does a diagnosis of "mild mental retardation." The Tenth Circuit has characterized 12.05C as addressing "mild mental retardation,"[57] the same characterization that Plaintiff urges.  The Tenth Circuit has further explained that "[t]he purpose of §12.05C is to compensate a claimant with an IQ in the 60-70 range and a limitation of function that affects his work."[58]  Plaintiff has an IQ in that range and physical, as well as mental limitations that affect his work.  Plaintiff is precisely the type of individual who is considered disabled under listing 12.05C.

Moreover, even if a person with "borderline intellectual functioning" cannot meet the capsule definition, to the extent the ALJ accepted that diagnosis by Drs. Pulcher and Adams without question or analysis, the ALJ erred.  For the ALJ is responsible for deciding the ultimate question of whether or not a claimant's impairments meet or equal the impairments in the listing.[59]  While this decision necessarily relies upon medical evidence, it is the role of the ALJ to evaluate this evidence in light of the objective standards and requirements of the listing.

Notably, Dr. Pulcher's stated reason for diagnosing Plaintiff as having "borderline intellectual functioning," rather than mental retardation, was "[t]he full scale IQ of 69 coupled with a history of having held previous employment for periods of several months suggest that he probably functions at the borderline intellectual functioning level."  Dr. Adams gave no reason for her diagnosis.  To the extent the ALJ relied upon this part of Dr. Pulcher's opinion in

---

[56]*See Bishop v. Barnhart*, No. 04-4078, 2005 WL 946560, at *7-8 (D. Kan. Mar. 15, 2005); 67 Fed. Reg. 20,018, 20022 (Apr. 24, 2002).

[57]*McKown v. Shalala*, No. 93-7000, 1993 WL 335788, at *1 (10th Cir. Aug. 26, 1993).

[58]*Hinkle v. Apfel*, 132 F.3d 1349, 1352 (10th Cir. 1997) (quoting *Sird v. Chater*, 105 F.3d 401, 403 n.6 (8th Cir. 1997)).

[59]SSR 96-6p, 1996 WL 374180, at *3 (S.S.A. July 2, 1996).

concluding that Plaintiff did not meet the listing, there are several layers of error. First, a valid full scale IQ score of 69 meets one of the three criterion for the listing. Second, in applying the listing, a past history of work does not otherwise negate the claimant's fulfillment of the requirements of the listing. As the court noted in *Durden v. Astrue*,[60] someone with mild mental retardation may manage to hold an unskilled job despite his or her intellectual limitation, but when faced with an additional impairment, be unable to work. Indeed, as the Tenth Circuit has recognized, this is the very purpose of listing 12.05C.[61] Listing 12.05C recognizes that someone with IQ scores within the range, and who suffers from a severe physical or other mental limitation, is disabled, irrespective of past work history. Third, the ALJ abdicated his responsibility to apply the objective criteria of the listing, if the ALJ merely accepted Dr. Pulcher's diagnosis, which clearly did not apply the objective criteria of listing 12.05C.

There is significant evidence that Plaintiff suffers from significant subaverage general intelligence and deficits in adaptive functioning that manifested in his developmental years. In addition to his valid IQ scores, both Drs. Pulcher and Adams opined that Plaintiff could understand and follow only simple instructions; Dr. Pulcher even found that this was problematic unless Plaintiff received the instructions visually. Dr. Pulcher concluded that Plaintiff "is not capable of managing funds and would benefit from a responsible payee." The third party reports also evidence that Plaintiff has to be constantly told and reminded about the importance of taking his medication, that he is "not mentally equipped to handle finances," that he is "unable to comprehend or follow instructions," and that he is "unable to handle (changes in routine)

---

[60]586 F. Supp. 2d 828, 838 (S.D. Tex.2008).

[61]*Hinkle*, 132 F.3d at 1352.

15

because of poor understanding." Both Plaintiff and his sister reported that he has never had a bank account or credit card, never paid bills, never shopped for groceries or other necessities, never been able to drive and never been able to take public transportation by himself. These are all deficits in activities of daily living and adaptive functioning, and material to an assessment of the severity of a claimant's mental RFC at step 4,[62] as well as material to the capsule definition in listing 12.05C. Adaptive functions include cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, personal grooming and hygiene, using telephones and directories, and using a post office.[63]

Other probative evidence that a claimant meets the capsule definition includes evidence such as having been in special education classes yet still struggling, dropping out of school because of academic failure, inability to read and write despite years of schooling, inability to manage funds and difficulty driving.[64] Plaintiff was in special education, struggled and made mostly Ds, dropped out of high school, and is unable to read or write very well, including being unable to read a newspaper. By all these measures, there is significant evidence in the record that Plaintiff meets the capsule definition.

Having not evaluated Plaintiff under listing 12.05C, the only germane finding the ALJ made concerning Plaintiff's intellectual functioning was that Plaintiff's "borderline intellectual

---

[62]20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C).

[63]*Id.* § 12.00(C)(1).

[64]*See, e.g*, *Maresh v. Barnhart*, 438 F.3d 897, 900 (8th Cir. 2006) (relying upon evidence that plaintiff struggled through special education classes, dropped out of ninth grade and currently had trouble reading, writing and with math); *King v. Barnhart*, No. 1:06-cv-0381-DFH-TAB, 2007 WL 968746, at *3 (S.D. Ind. Feb. 26, 2007) (finding claimant to have deficits in adaptive functioning where he was incapable of independently managing funds, and where he relied upon friend for transportation despite managing to get a driver's license after having the driver's test orally read to him).

functioning has not been grossly apparent to any treating health provider,"[65] a negative inference the ALJ drew from the fact that these treating providers made no mention of Plaintiff's intellectual functioning.  But, these treating health providers were treating Plaintiff's left ankle and right foot, and did not conduct mental status examinations.  In *Harrold v. Astrue*,[66] the Commissioner rejected the report of an examining clinical psychologist that noted that during a physician's physical examination, the claimant described himself as having a learning disability, not as mentally retarded.  The Tenth Circuit found it "particularly inappropriate for the Appeals Council to draw a negative inference" from the report of a physician who was neither treating nor examining the claimant for his mental limitations.[67]  The Tenth Circuit further found that the fact that the treating physicians had not noted observations consistent with a diagnosis of mental retardation was also an insufficient reason to reject the psychologist's report.[68]  For the same reason, this Court finds it inappropriate to draw a negative inference from the fact that the reports of those treating Plaintiff for physical problems were silent on Plaintiff's intellectual functioning.

The observations of those who examine the claimant for mental limitations are more germane than any unstated observations of those who were examining the claimant for physical limitations.  And, the ALJ apparently did not consider Dr. Pulcher's statement that "it was very difficult to obtain clear explanations or description of depressive symptoms by this claimant,"

---

[65] Doc. 8, Attach. 3, R. at 16.

[66] 299 F. App'x 783, 787, (10th Cir. 2008).

[67] *Id.*

[68] *Id.*

and that although "there were no obvious hearing, speech, or communication disorder . . . his speech content was quite concrete."[69] Dr. Pulcher also noted that Plaintiff was unaware of what city he was in. Nor did the ALJ fully consider the mental status examination by Robin Tucker, ANRP at the Wyandot Center in April 2009. Tucker noted that Plaintiff "is alert and oriented to time, place, person and situation. Immediate memory recall is 2 out of 3 after 5 minutes. Recent and remote recall are intact. Client was unable to perform Serial 7s; however he was able to spell the word world backwards with 2 errors. Client was unable to utilize abstract thinking for proverbs. . . . Insight is suboptimal to poor."[70] To be sure, an ALJ is not required to discuss every piece of evidence so long as the record demonstrates that he considered all of the evidence.[71] But the ALJ must discuss the uncontroverted evidence the ALJ chooses not to rely upon as well as any significantly probative evidence the ALJ decides to reject.[72]

## V.  Conclusion

Although the Court finds significant evidence that Plaintiff meets the capsule definition, this evidence was not discussed or evaluated by the ALJ. Understanding the deference to be given the Commissioner, the Court finds that this case should be remanded. This case is much like the case of *Peck v. Barnhart*,[73] where the court remanded the matter to the ALJ for development of the record when there was no dispute that Plaintiff met the IQ scores and additional impairment prongs of 12.05C, but some dispute about whether Plaintiff met the

---

[69]Doc. 8, Attach. 8, R. at 356.

[70]*Id.* at 262.

[71]*Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996).

[72]*Id.*

[73]214 F. App'x 730 (10th Cir. 2006).

capsule definition.[74]  There, like here, the ALJ did not consider the application of listing 12.05C at all.  Thus, the Court will remand this matter to Defendant, and direct Defendant to consider 12.05C, consider the significant evidence that Plaintiff has deficits in adaptive functioning and the other significant probative evidence on whether Plaintiff has subaverage general intellectual functioning.  Among other evidence, the ALJ should consider the narrative explanations provided by Dr. Pulcher in his mental status exam and IQ scoring.  The Court sees no reason to remand for a determination whether Plaintiff meets the other requirements of listing 12.05C; he clearly does.  Thus, this remand is limited to a determination of whether Plaintiff meets the capsule definition of listing 12.05C.  In making the determination, the ALJ shall apply the regulations and case law discussed in this opinion.

For these reasons, the Court reverses and remands this case pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings in accordance with this Memorandum and Order.

**IT IS THEREFORE ORDERED BY THE COURT THAT** Defendant's decision denying Plaintiff disability benefits is **REVERSED and REMANDED pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings in accordance with this Memorandum and Order.**

**IT IS SO ORDERED.**

Dated: February 8, 2012

 S/ Julie A. Robinson
 JULIE A. ROBINSON
 UNITED STATES DISTRICT JUDGE

---

[74] *Id.* at 734–35.